UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALTA PARTNERS, LLC<br><br>              Plaintiff,<br><br>          -against-<br><br>GETTY IMAGES HOLDINGS, INC.,<br><br>              Defendant. | No. _____<br><br>**COMPLAINT** |

Plaintiff Alta Partners, LLC ("Alta") files this action for breach of contract and declaratory judgment against Defendant Getty Images Holdings, Inc. ("Getty Images"), and alleges as follows:

**INTRODUCTION**

1.      This action arises from Getty Images' scheme to deny public warrant holders their contractual right to purchase Getty Images stock at an agreed upon strike price, while generating a massive windfall for corporate insiders.  Getty Images carried out its scheme by breaching its contractual obligation to honor public warrant holders' requests to exercise their warrants, based on the demonstrably untrue and legally untenable contention that the shares were not registered with the Securities and Exchange Commission ("SEC").  As a consequence, Getty Images artificially restricted the public float, boosting its share price and allowing insiders to achieve outsized incentive payments.  And, once its self-interested goals had been achieved, Getty Images purported to redeem the public warrants for a penny each, destroying their remaining value.  This complaint seeks damages for Getty Images' contractual breaches and a declaration that Getty Images' attempt to redeem the warrants while in material breach of the warrant agreement is invalid.

2.     After Getty Images went public by merger with a special purpose acquisition vehicle (or "SPAC") in mid-2022, both Getty Images' SPAC sponsor and legacy executives were entitled to a massive haul of incentive shares in the surviving company if they could cause the share price to trade above $18 for a span of 20 out of 30 days.  Through the SPAC merger, Getty Images was able to go public with an exceptionally small float of barely 500,000 publicly traded shares, more akin to an over-the-counter penny stock than an established company that bills itself as a preeminent global content creator and marketplace.  Getty Images' inordinately small public float practically invited a so-called "meme stock" rally in which investors artificially drive up the price of shares through online and social media attention.  All that stood between Getty Images' insiders and their incentive shares were the 20.7 million public warrants with a strike price of $11.50 that, if exercised, would flood the market with additional publicly traded shares and jeopardize the high-flying share price.  To avoid this outcome, Getty Images refused to honor the contractual exercise rights of public warrant holders, using the thinnest of excuses to veil their deliberate disregard for warrant holder rights.

3.     Getty Images' public warrants are governed by an agreement, dated August 4, 2021 (the "Warrant Agreement"), between Getty Images and the transfer agent American Stock Transfer & Trust Co., LLC ("AST").  The Warrant Agreement establishes two conditions for the exercise of the Getty Images public warrants.  *First*, 30 days must have passed since completion of the business combination between Getty Images and the SPAC used to take Getty Images public (the "Business Combination").  *Second*, the Getty Images shares for which the warrants are exchangeable (the "Warrant Shares") must be registered with the SEC under the Securities Act of 1933 (the "Securities Act")—which Getty Images is contractually obligated to effectuate "as soon as practicable."

4.     Both conditions were met by August 22, 2022, when Alta sought to exercise a portion of its warrant holdings.  The 30-day waiting period had lapsed on August 21, 2022.  And the Warrant Shares were registered pursuant to a Form S-4 registration statement that had been effective since June 30, 2022.  There can be no doubt that the Warrant Shares were registered pursuant to the Form S-4 registration statement:  the cover page of the Form S-4 specifically identified the Warrant Shares as being covered, and the SPAC's lead deal counsel signed a publicly filed opinion letter as part of the SPAC merger confirming that the Form S-4 registration statement registered the SPAC warrants.  Indeed, it is standard practice to register shares pursuant to a Form S-4 in SPAC mergers, where, as here, public warrants issued by the SPAC are exchanged for shares issued by the company created by the SPAC merger.

5.     Yet, in response to Alta's exercise notice, Getty Images abruptly reversed course and took the untenable position that its Form S-4 did *not* register the Warrant Shares.  It did so, as explained in more detail below, to prevent an infusion of new Getty Images shares that would jeopardize massive incentive payments that would be paid to insiders if Getty Images could sustain a share price above $18 per share for a few days longer.

6.     By the time Getty Images claims that the Warrant Shares were registered—on September 15, 2022, pursuant to a later-filed Form S-1 registration statement—Getty Images' share-price incentives had already been triggered, enriching insiders to the tune of approximately $2.5 billion based on the share price at issuance, and still worth more than $500 million today. More importantly, from the perspective of public warrant holders, Getty Images' share price had come back to earth, driven by the increased public float generated by the Form S-1 registration statement and, in particular, the *en masse* disposal of shares by insiders the moment the Form S-1 became effective.  By September 16, 2022, when the company claims the public warrants were

first exercisable, Getty Images' share price had plummeted below the warrants' $11.50 strike price, pushing the warrants firmly "out of the money," where they have sat ever since.

7.     On September 19, 2022, Getty Images compounded its contractual breaches by purporting to redeem the public warrants for a redemption price of $0.01 each, based on Getty Images' inflated share price during the period when the company had refused to honor Alta's exercise attempts.   If permitted, the redemption would render Alta's investment effectively worthless.

8.     Through this complaint, Alta seeks damages for the harm caused by Getty Images' refusal to honor Alta's valid exercise of the public warrants and repudiation of its obligation to do so under the Warrant Agreement.   Alta further seeks a declaration that Getty Images attempt to exercise its redemption rights while in material breach of the Warrant Agreement is invalid, and that Alta has no obligation to tender its warrants in the redemption.   And Alta seeks additional compensation for the loss in value of its warrant position caused by Getty Images' improper redemption.

## JURISDICTION AND VENUE

9.     Subject matter jurisdiction exists under 28 U.S.C. § 1332, there being complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy substantially exceeding $75,000.   Subject matter jurisdiction also exists under 28 U.S.C. § 1331 because the complaint raises questions of federal law regarding the proper interpretation of the Securities Act and regulations promulgated thereunder.

10.     This Court may exercise personal jurisdiction over Defendant pursuant to 28 U.S.C. § 1391 based on the terms of the Warrant Agreement.   Section 9.3 of that Agreement provides that the parties (and their successors) "irrevocably submit[]" to the jurisdiction of "the courts of the

State of New York or the United States District Court for the Southern District of New York."
The courts of the State of New York or the United States District Court for the Southern District
of New York have exclusive jurisdiction over "any action, proceeding or claim arising out of, or
otherwise based on, this Agreement," and the parties "waive[] any objection to such exclusive
jurisdiction and that such courts represent an inconvenient forum."

**THE PARTIES**

11.    Plaintiff Alta is a limited liability company, which is a citizen of each state where
one or more of its members is a citizen.  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60
(2d Cir. 2016).  Alta has two members, Steven Cohen who is domiciled in Puerto Rico and Howard
Cohen who is a citizen of New York.  Alta is the registered owner of a majority of the public
warrants of Getty Images.

12.    Defendant Getty Images, a global visual content creator and marketplace, is a
public company whose common stock is traded on the New York Stock Exchange under the ticker
GETY.  Getty Images is a Delaware corporation with its principal place of business in Seattle,
Washington.

**FACTS**

## I.    Background On SPACs

13.    A special-purpose acquisition company ("SPAC"), also known as a blank check
company, is a publicly traded company that holds cash in trust for its investors, and exists solely
for the purpose of identifying a non-public target company to combine with in a business
combination that provides the target company capital and brings the company public as an
alternative to the traditional initial public offering ("IPO") process.  This take-public transaction
is usually referred to as a "de-SPAC" transaction.

14.     SPACs have grown in popularity over the last several years.  The SPAC structure is considered advantageous to some private companies (primarily late-stage startups) because it allows the company to go public on a faster timeline while avoiding some of the market volatility concerns associated with a traditional IPO process.  The de-SPAC process is more streamlined than an IPO and can allow the target board to maintain control of the combined company.

15.     The lifecycle of a typical SPAC begins before the SPAC's listing when a related entity, called a "sponsor," provides the funding that allows the SPAC to conduct an IPO and raise capital from outside investors.  The SPAC offers and sells investments called "units" to investors, consisting of one share of common stock and a fraction of a warrant.  The funds raised by the SPAC are held in trust for the benefit of the shareholders until a merger occurs.  The common stock and the warrants are all registered under the Securities Act as part of the IPO and are publicly traded.  After a period of time, the public units separate and SPAC investors are permitted to sell their warrants while retaining their common stock.

16.     Once the SPAC has completed its IPO, the SPAC will have a period of time in which to consummate a de-SPAC transaction—typically two years.  After that term expires, the SPAC must return all of the funds held in trust to its investors on a *pro rata* basis.  Those funds will have earned a nominal amount of interest in the meantime that provides a return to investors.  SPAC investors can also sell their warrants to third-party buyers for additional return on their investment.

17.     Alternatively, once the SPAC has announced a merger and secured shareholder approval, the SPAC shareholders may still elect to "redeem" their shares in exchange for a *pro rata* portion of the funds held in trust by the SPAC.  Redemptions reduce the amount of capital accruing to the operating entity following the de-SPAC transaction.  Thus, the sponsor and the

SPAC's underwriters usually attempt to "recirculate" redeemed SPAC shares to real-money investors prior to the close of the de-SPAC transaction, who are more likely to participate in the business combination rather than redeem their SPAC investment.

18.     Upon successful completion of a business combination, the sponsor typically receives an equity allocation from the new combined entity, often referred to as the sponsor's "promote."  Insiders of the target company may also receive share awards as part of the de-SPAC transaction.

19.     Following a successful business combination with a target company, investors in the SPAC become shareholders of the target company.  The technical mechanics of a de-SPAC transaction can take several forms.  The SPAC itself can acquire the target operating company. Alternatively, a new entity, referred to as a "PubCo," may be formed into which the SPAC and the target company both merge.  In that case, the PubCo will survive the de-SPAC transaction as the publicly traded company, but will need to issue (and therefore register) new shares, warrants, and warrant shares in exchange for the shares and warrants previously held by the SPAC's investors.

20.     The PubCo typically will register the new shares, warrants, and warrant shares provided to SPAC investors as part of the business combination though a Form S-4 registration statement.  The applicable SEC regulations and Form S-4 instructions clearly provide that the Form S-4 may be used for "securities issued in connection with business combination transactions," including securities issued "on a continuous or delayed basis" after the date of the merger itself. 17 C.F.R. § 230.415(a)(1)(viii).[1]

---

[1]   General Instruction A, appearing in the Rule as to Use of Form S-4, makes clear that the Form S-4 "may be used for registration under the [Securities Act] of securities to be issued in a transaction of the type specified in paragraph (a) of Rule 145 (§ 230.145 of this chapter). General Instruction H of the Form S-4, which is titled "Registration Statement Subject to Rule

21.     In just the past three years, there are numerous instances of the Form S-4 registrant either permitting exercise of warrants or acknowledging that warrants to purchase the registrant's stock were exercisable solely on the basis of an effective Form S-4 registration statement. Examples include: Cipher Mining (CIFR), Bakkt Holdings (BKKT), Fiscalnote Holdings (NOTE), and Shapeways Holdings (SHPW).

22.     Similarly, there are multiple post-business combination companies that permitted exercise of warrants based solely on an effective F-4 registration statement, the foreign-issuer equivalent of the Form S-4. Examples include: Li-Cycle Holdings (LICY), Nexters (GDEV), LumiraDX (LMDX), and Tritium DCFC (DCFC).

23.     Indeed, use of the Form S-4 to register SPAC warrants is so commonplace that publications regarding SPAC mechanics often describe the warrants as becoming exercisable on the sole condition that 30 days have passed from the closing date of the business combination.[2]

24.     Additionally, the business combination agreement that governs the SPAC transaction may provide that the sponsor and target company insiders receive additional "promote" shares if the post-merger entity's stock price meets certain benchmarks.  These additional "promote" shares are intended to better align the incentives of the SPAC sponsor, the target company insiders, and the SPAC's public shareholders.

25.     The sponsor and other insiders are often subject to a lock-up period following the consummation of the merger, during which time they cannot sell their shares.  Therefore, the post-

---

415(a)(1)(viii) (§230.415(a)(1)(viii) of this chapter)," further confirms that securities offerings pursuant to 17 U.S.C. § 231.415(a)(1)(viii) are covered by the Form S-4.

  [2]  *See*, *e.g.*, Special Purpose Acquisition Companies, Shell Companies, and Projections, 87 Fed. Reg. 29458, 29460 n.15 (May 13, 2022); Special Purpose Acquisition Company (SPAC), Corporate Fin. Inst. (updated Sept. 13, 2022), https://corporatefinanceinstitute.com/resources/knowledge/strategy/special-purpose-acquisition-company-spac/.

combination entity's freely tradable share float will often be limited to shares of the surviving entity exchanged for shares held by non-redeeming SPAC shareholders as part of the merger, and the warrant shares of the surviving entity, to the extent warrant holders choose to exercise their warrants after required non-exercise period—usually 30 days.  The warrants remain outstanding even if a SPAC investor chooses to redeem its investment in common stock.

26.    Where a large number of redemptions by SPAC shareholders reduces the capital that the SPAC is able to contribute to the business combination, this capital is often replaced by private investment in public equity (or "PIPE") investment, whereby the SPAC sells additional common stock in private placement transactions to raise additional funds.  These private placement transactions fill any gap in the consideration required from the SPAC to complete the business combination.  PIPE investors commonly receive better terms than investors in SPAC units, creating incentives for the sponsor to maximize unitholder participation.

## II.    The Meme-Stock Phenomenon And Consequences Of A Small Public Float

27.    As noted above, the number of publicly traded shares (known as the "public float") following a SPAC transaction is tied to the number of SPAC investors that chooses to participate, rather than redeem their shares.  Where there is a small float, trading price of the public shares can be subject to artificial inflation due to what is commonly known as the "meme-stock" phenomenon.

28.    A "meme-stock" is a stock that becomes popular on online forums used by day-traders such as the Reddit subforum called "Wall Street Bets."  Day traders in these forums seek to band together to push, or "squeeze," the price of publicly traded stocks higher, frequently targeting stocks with small public floats, large shorting interest, or both.  Companies that become meme-stocks can experience temporary share price growth of 3X or higher, which almost always dissipates once short interests are cleared and/or a sufficiently large amount of additional shares are added to the public float.

29.     The meme-stock phenomenon is how, for example, the publicly-traded gaming company, GameStop, saw its share price explode from around $18 per share in early January 2021 to an intraday high of over $450 per share.  Daily trading volumes of astronomical proportions accompanied the increase in GameStop's share price—at its peak, daily trading volume reached more than 25 times the average volume during the first week of January 2021.  All of this activity occurred during a time when there was no news about GameStop that would have supported a wholesale reevaluation of the company's fundamental value.  The event itself proved highly newsworthy, however, with much of the attention focused on the role that social media—in particular posters on Wall Street Bets and associated chat rooms on the popular platform Discord— played in initially fomenting the frenzy.  The episode ultimately spawned Congressional hearings but little in the way of concrete action designed to impede investors from engaging in concerted, collective action to manipulate stocks with certain characteristics.  Among these are stocks that have unusually small freely tradable floats (often, but not always, because a high proportion of outstanding shares have been sold short).

30.     Where deal insiders are incentivized to produce temporarily sustained share-price increases, a meme-stock rally offers an alternative to fundamental growth and performance in achieving share-price targets.

## III.    The CCNB SPAC And The Business Combination

31.     The SPAC at issue in this matter was CC Neuberger Principal Holdings II ("CCNB SPAC"), which, prior to the Business Combination, was a Cayman Islands exempted company.

32.     In all respects relevant to this Action, the CCNB SPAC's structure and deal cycle mirror the general description contained in Paragraphs 13–26.

33.     On July 30, 2020, the CCNB SPAC raised $828 million through an IPO.  Investors in the CCNB SPAC received one share of CCNB SPAC common stock and 1/4 of a warrant

exercisable at $11.50 to purchase CCNB SPAC common stock for every $10 invested.  In total, after combining fractional public warrants, the CCNB SPAC issued 20.7 million public warrants as part of its IPO.

34.     On December 9, 2021, the CCNB SPAC announced and entered into a Business Combination agreement with Griffey Global Holdings, Inc., the holding company housing the pre-Business Combination operating business of Getty Images.

35.     The Business Combination agreement was littered with hefty incentives for CC Neuberger Principal Holdings II Sponsor LLC ("CCNB Sponsor") and Getty Images' insiders if the post-Business Combination company could achieve certain share-price targets for a specified period of time.  *First*, if the share price traded above $18 per share for 20 out of 30 consecutive trading days, Class B shares granted to CCNB Sponsor would vest into 5.14 million shares of Class A common stock.  *Second*, based on the same share-price trigger, Getty Images' legacy executives and other target company shareholders would receive an installment of nearly 60 million earn-out shares immediately with another installment totaling millions more to be paid in the future.  *Third*, the artificial share-price inflation would allow CCNB Sponsor to exercise 18.56 million private placement warrants granted to it as part of the Business Combination on a cashless basis—an option not afforded to public warrant holders—to create millions more of CCNB Sponsor-owned shares out of thin air.

36.     The vast majority of CCNB SPAC investors declined to participate in the Business Combination, instead choosing to redeem their stock in CCNB SPAC before it closed.  Specifically, holders of 82,291,689 shares elected redemption, while only 508,311 shares remained in the public float, meaning approximately 99.4% of shareholders redeemed their shares.

37.     Thus, out of nearly eighty-three million CCNB SPAC shares issued as part of CCNB SPAC's initial public offering, barely 500,000 shares participated in the Getty Images Business Combination, meaning the SPAC's public investors contributed only $5 million in capital to the surviving entity.  As a result, Getty Images, a well-known company, began trading on the NYSE with a free float akin to an over-the-counter penny stock—setting the stage for a meme-stock driven share-price squeeze upwards.

38.     The exceptionally low participation in the Business Combination by the CCNB SPAC's investors strongly suggests that CCNB Sponsor made no effort to recirculate the CCNB SPAC shares to real-money buyers in order to preserve the amount of CCNB SPAC capital that was contributed in the Business Combination.  There would be little incentive to forego this standard procedure unless CCNB Sponsor had incentive to keep to the float extremely low.

39.     The de-SPAC merger closed on July 22, 2022, and Getty Images stock began publicly trading on the New York Stock Exchange on July 25, 2022.

**IV.     The Terms Of The Public Warrants And Registration Of The Warrant Shares**

40.     Given the extraordinarily low amount of publicly traded shares in Getty Images that existed following the Business Combination, all that stood between CCNB Sponsor and Getty Images' insiders, on the one hand, and the massive incentive payments they would receive if the stock price took off, on the other, were the public warrants.  If exercised, the public warrants threatened to dramatically increase the free float of Getty Images shares, placing downward pressure on the share price and jeopardizing attainment of the share-price benchmarks that would trigger the insider incentives.

41.     The public warrants were issued pursuant to a Warrant Agreement between CCNB Sponsor and Continental Stock Transfer & Trust Company, dated August 4, 2020 (the "Warrant

Agreement"), and assumed by Getty Images as part of the de-SPAC transaction pursuant to a Warrant Assignment, Assumption, and Amendment Agreement, dated as of July 22, 2022.

42.     The terms and conditions of the Warrant Agreement are expressly incorporated into each warrant certificate, and are enforceable against Getty Images by each public warrant holder.

43.     Pursuant to the Warrant Agreement, Getty Images' warrants are exercisable upon (i) passage of 30 days from completion of the Business Combination and (ii) registration of the Warrant Shares under the Securities Act.   Warrant Agreement §§ 3.2, 3.3.2.   The Warrant Agreement sets the exercise price as $11.50.   *Id.* § 3.1.   Getty Images further agreed to "as soon as practicable . . . use commercially reasonable efforts to file with the Commission a registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the Warrants."   *Id.* § 7.4.1.

44.     The public warrants and underlying Warrant Shares were permitted to be registered, and in fact were registered, pursuant to an Form S-4 registration statement.   That Form S-4 registration statement was originally filed on January 18, 2022, and amended by Forms S-4A filed on March 15, 2022, April 22, 2022, June 13, 2022, June 27, 2022, and June 29, 2022.[3]   And it was declared effective on June 30, 2022.

45.     The registration of the Warrant Shares, in addition to the warrants, is clearly reflected on the very first page of the original Form S-4 registration statement:

---

[3]   The Form S-4 and Forms S-4A were filed by Vector Holdings, LLC, the PubCo that became Getty Images upon completion of the Business Combination.

| CALCULATION OF REGISTRATION FEE | | | | |
|---|---|---|---|---|
| Title of Each Class of Securities to be Registered[2] | Amount to be Registered[2] | Proposed Maximum Offering Price Per Security | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
| New CCNB Class A Common Stock, par value $0.0001 per share[4] | 150,475,093 | $9.885 | $1,487,446,294.31 | $137,886.27 |
| New CCNB Series B-1 Common Stock, par value $0.0001 per share[3] | 2,570,000 | — | — | — |
| New CCNB Series B-2 Common Stock, par value $0.0001 per share[4] | 2,570,000 | — | — | — |
| New CCNB Warrants to purchase common stock[5] | 39,260,000 | — | — | — |
| New CCNB Class A Common stock underlying warrants[6] | 39,260,000 | 11.50 | 451,490,000 | 41,853.12 |
| Total | | | $1,938,936,294.31 | $ 179,740 |

(1)   All securities being registered will be issued by Vector Holding, LLC ("New CCNB") following its statutory conversion to a corporation in connection with the Business Combination to be issued pursuant to the merger of CC Neuberger Principal Holdings II ("CCNB") with and into Vector Domestication

Form S-4 registration statement, January 18, 2022, at 1.  The Form S-4 registration statement further reflects separate payment $41,853.12 for registration of the "Class A Common stock underlying the warrants."  It would make no sense for Getty Images to pay a registration fee for the Warrant Shares if it were not intending to register them pursuant to the Form S-4 registration statement.

46.     The registration of the Warrant Shares is further confirmed by the opinion letter of CCNB SPAC's lead deal counsel, Kirkland & Ellis LLP, dated, June 27, 2022 (the "K&E Opinion Letter"), and attached as Exhibit 5.1 to the final amendment of the Form S-4 registration statement, dated June 29, 2022.  In the K&E Opinion Letter, Getty Images' chief deal counsel states:

> We have acted as special legal counsel to [Getty Images] . . . in connection with the Registration Statement on Form S-4 initially filed with the U.S. Securities and Exchange Commission (the "Commission") on January 18, 2022, as amended and supplemented through the date hereof pursuant to the Securities Act of 1933 . . . This opinion is being rendered in connection with the registration under the above-referenced Registration Statement of . . . (iv) 39,260,000 [warrants] and (v) **39,260,000 Warrant Shares**.

K&E Opinion Letter, at 2 (emphasis added).[4]

---

[4]   The Commission reviewed and commented on an earlier version of the K&E Opinion Letter (dated June 13, 2022) but raised no issue with the statement regarding registration of the Warrant Shares, which K&E repeated in its final Opinion Letter dated June 27, 2022, and attached to the final amendment of the Form S-4 Registration Statement.  For the comment and K&E's

47.     Given that the Warrant Shares were in fact registered pursuant to the S-4 registration statement declared effective June 30, 2022, the only remaining condition for the public warrants to become exercisable was passage of 30 days from the date of completion of the Business Combination pursuant to Section 3.2 of the Business Combination Agreement.   The Business Combination was completed on July 22, 2022, meaning that the 30-day waiting period expired on August 21, 2022.   Accordingly, the public warrants became exercisable as of August 22, 2022.

## V.      Getty Images Share Price Takes Off Following The Business Combination

48.     As noted above, Getty Images, a well-known company that purportedly owns one of the world's largest and best photographic archives with millions of images, first began trading publicly on the NYSE with a free float of roughly 500,000 shares, comparable to an over-the-counter penny stock.   The minimal float associated with a known company like Getty Images was conducive to a meme-driven upward squeeze on the shares trading price, once the Business Combination was consummated and sufficient attention was garnered on social media.   Such a frenzy quickly materialized.

49.     The following chart depicts Getty Images' share price activity between the first day of post-Business Combination trading, July 25, 2022, and the date when the warrants became exercisable, on August 22, 2022:

---

amended language in response thereto, see June 24, 2022, Letter from the Commission to Seligman and June 27, 2022, Letter from Seligman to the Commission.



50.     As reflected on the chart, on July 29, 2022, the stock took off and soared to a price $26.15 per share by market close, well above the $18 per share trigger for CCNB Sponsor and management incentives.  Between July 29, 2022, and August 21, 2022, the stock closed each trading day above $18 per share, completing 16 of the necessary 20 trading days (out of any given 30 trading days) for share-price incentives to vest pursuant to the Business Combination Agreement.

51.     Thus, Getty Images and its corporate insiders were caught in a predicament as of August 21, 2022.  On the one hand, they were on the cusp of a massive windfall, with only four more days of a meme-stock inflated share price needed to reach the magic number of 20 out of 30 trading days above $18 per share.  On the other hand, if a substantial number of public warrants were exercised over the next several days, that would infuse the market with new Getty Images shares, put a damper on the meme-stock rally, and potentially erase insiders' gold-plated dreams at the eleventh hour.

**VI.    Alta Attempts To Exercise The Public Warrants And Getty Images Blocks It**

52.    On August 22, 2022—the first trading day on which the warrants were exercisable pursuant to the terms of the Warrant Agreement—Getty Images shares traded at an average price of $28.94.  Pursuant to the terms of the Warrant Agreement, Alta was entitled to purchase Getty Images shares for only $11.50 per share, a substantial discount to prevailing market prices. Accordingly, on that date, pursuant to its rights under the Warrant Agreement, Alta sent a notice of exercise for certain of its Getty Images public warrants.

53.    Getty Images knew that allowing exercise of the public warrants threatened to flood the market with up to 20.7 million additional public tradable shares, vastly eclipsing the existing 500,000 public share float and jeopardizing the share-price run above $18 per share just before it paid off.

54.    Rather than risk losing the upcoming trigger on the incentives, Getty Images chose to breach the Warrant Agreement and refused to honor Alta's exercise notice.  At the same time, Getty Images repudiated its obligations under the Warrant Agreement, claiming without basis and contrary to all evidence that the public warrants could not be exercised because they had not been registered.  According to Getty Images, the warrants would be exercisable only following the effective date of a Form S-1 registration statement which Getty Images had filed in early August, and which ultimately would not become effective until mid-September.  Getty Images' self-serving contention that the Form S-1 governed the Warrant Shares—not the Form S-4 that had been effective since June—directly contradicted the face of the Form S-4 registration statement and the clear statement of CCNB Sponsor's lead deal counsel.

55.    Moreover, warrants acquired in connection with SPACs are commonly registered through a Form S-4 filed prior to the business combination, and SPAC investors routinely are able to exercise their warrants on that basis.

17

56.     Getty Images' decision not to honor the public warrants massively benefited CCNB Sponsor and Getty Images' insiders.  The Getty Images share price stayed above $18 per share for eight more days, locking in enormous insider payouts.  CCNB Sponsor's Class B shares vested into 5.1 million shares of Class A common stock.  Getty Images' legacy executives and other target company shareholders received an immediate distribution of nearly 60 million "earn-out" shares.  Getty Images also disclosed that it intended to issue a further six million shares in the future as a result of the stock-price hurdles being met.  The total sum of newly created shares issued to the Sponsor and Getty Images' insiders as part of these transactions had a value, as of August 26, 2022, of nearly $2 billion; even after recent declines in the share price these shares have a current market value in excess of $375 million.  And close affiliates of the CCNB Sponsor cashless exercised all of the private placement warrants to create 11.56 million additional shares worth $267 million based on the average share price on the exercise date (August 29, 2022), and are still worth more than $60 million.

57.     Getty Images' insiders and the Sponsor reaped these massive gains entirely on the backs of the public shareholders and public warrant holders.  While the public shareholders were heavily diluted based on an unsustainable increase in the stock price untethered to long-term shareholder value, the public warrant holders were wiped out entirely based on trading prices they were never allowed to participate in.  What is more, Getty Images' self-serving suppression of public warrants prevented an increase in float and participation that would have enhanced market efficiency and price discovery, thereby distorting the market for Getty Images shares and harming

all non-insider shareholders.  As one commentator opined, the scenario was "a convoluted tale of financial engineering highlighting the perverse consequences of a stock being hyped online."[5]

58.    Following the August 22, 2022 exercise notice, Alta repeatedly objected to Getty Images' refusal to honor Alta's valid exercise attempts, but to no avail.  The public warrants remained "in the money" for the next 14 trading days, with the Getty Images share price peeking at nearly $32 per share—2.78 times the strike price.  Alta, however, was denied the opportunity to exercise into this favorable share price because Getty Images breached and repudiated its obligations under the Warrant Agreement.

59.    On August 31, 2022, two key insiders—Neuberger Berman Group LLC and Chi Chinh—disclosed that they had exercised on a cashless basis all 18,560,000 of their private placement warrants.  The insiders' cashless exercise was carried out at a sizable ratio of .6 shares per warrant, resulting in an infusion of almost 12 million shares into the market.   Despite the unquestionably dilutive effect of the insiders' cashless exercise, Getty Images inexplicably refused to honor Alta's subsequent requests to redeem its public warrants at a far less dilutive ratio of .365 shares per warrant.  Getty Images' refusal is particularly indefensible given its statement in its Form S-1/A, issued two days after the insiders' cashless exercise, that it will consider "the dilutive effect on our stockholders" in determining whether to permit holders of public warrants to exercise their warrants on a cashless basis.

---

[5] Chris Bryant, *SPAC + Meme Stock = A Dangerous Combination*," Bloomberg (Sept. 27, 2022), https://www.bloomberg.com/opinion/articles/2022-09-27/what-s-wrong-with-this-spac-picture-gety-stings-warrants?leadSource=uverify%20wall.

**VII.    The Share Price Collapses And Getty Images Purports To Redeem The Public Warrants For A Penny**

60.    On September 1, 2022, well after CCNB Sponsor and Getty Images' insiders had secured their outsized payouts, the meme-stock rally predictably petered out and Getty Images' share price dropped precipitously, from a close of over $20 to $14.42.  It never again traded above $18 per share, and fell below the $11.50 per share strike price on September 13, 2022.  Following the effective date of the Form S-1 registration statement, the wave of insider selling that the market anticipated materialized and the price continued its downward march.  The following chart depicts Getty Images' share price activity from the date of the Business Combination to the present:



61.    The Warrant Agreement permits Getty Images, at its option, to redeem the warrants for $0.01 if Getty Images common stock trades above $18 per share for 20 of 30 consecutive trading days.  The purpose of this provision is to force warrant holders to exercise (and pay the strike price) if the warrants prove sustainably in the money, so that warrant holders cannot sit on their warrant position for leveraged exposure to the Getty Images' stock price.  The warrants must be registered on the date that the redemption notice is issued.

62.     On September 15, 2022, the Form S-1 registration statement was declared effective. The timing of the Form S-1 registration statement going effective appears carefully orchestrated to capture a narrow five-day window where the warrants were no longer "in the money," and thus could not be profitably exercised, but were nonetheless redeemable based on the inflated trading prices that prevailed in August.  The conclusion that Getty Images meticulously controlled of the timing of registration under the Form S-1 is supported by its decision to decline an offer from Alta to cashless exercise certain warrants on September 7, 2022.  It would have been economically irrational for Getty Images to not proceed with a cashless exercise of the public warrants on that date—when the share price was teetering on the downward price limit for such cashless exercise—unless it knew with virtual certainty that it would be able to complete the Form S-1 registration precisely at the time when it did, and therefore redeem the warrants for $0.01 each at a time when the warrant holders could not profitably exercise their warrants.  Absent the ability to retire the warrants entirely at a later point, waiving a cashless exercise that would reduce warrant-generated dilution by two-thirds would make no sense.

63.     On September 19, 2022, the second trading day following the date of the Form S-1 registration statement—only the second trading day on which the warrants could be exercised according to Getty Images' willful misinterpretation of U.S. securities laws—Getty Images issued a notice of its intent to redeem the public warrants.  Under the redemption notice, the public warrants are to be redeemed on October 19, 2022, for $0.01 per share.

64.     At the time Getty Images issued its redemption notice, the Getty Images share price had fallen below the warrants' $11.50 strike price.  If effective, the redemption notice would cause the five-year public warrants to be redeemed for only a penny each, destroying their going-forward value based on share-price performance that occurred entirely when the company took the position

that the public warrants were not exercisable.  In essence, Getty Images' conspicuously well-timed redemption rendered the previously valuable public warrants all but worthless.

65.     On October 12, 2022, Alta made a formal written demand on Getty Images, setting forth the claims asserted herein, advising Getty Images that it would not be tendering its warrants in response to the redemption notice, and stating that it would pursue any and all remedies available to it in light of Getty Images' breaches.  In the letter, Alta also offered to discuss a consensual resolution of the dispute raised therein.  Getty Images failed to substantively respond to Alta's demand letter.

66.     Instead of engaging with Alta, following receipt of the demand letter, Getty Images continued its pattern of bad faith conduct by attempting to impede Alta's ability to enforce its rights under the Warrant Agreement.  On October 14, 2022, in furtherance of Alta's claims, Alta requested that the transfer agent have its warrants taken out of "street name"—*i.e.*, the name of the brokerage firm that holds the securities on Alta's behalf—and placed in Alta's name as the registered holder.  In response, Alta was informed that the warrants were subject to a "chill" order pursuant to which the Depository Trust Company was restricted from making changes to the status of Alta's warrants.  On information and belief, the "chill" was imposed at the request of Getty Images and/or its transfer agent in order to stifle Alta's ability to bring its claims and enforce its rights given the dispute outlined in Alta's October 12 letter.  It was only after repeated requests, including by Alta's counsel, that the "chill" was ultimately lifted and the warrants placed in Alta's name as registered holder on October 18, 2022.

## CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT

67.     Plaintiff repeats each of the foregoing allegations as if fully set forth herein.

68.     Under the Warrant Agreement, Getty Images' public warrants are exercisable upon (i) the passage of 30 days from completion of the business combination and (ii) the effective registration under the Securities Act of the Warrant Shares.  Warrant Agreement §§ 3.2, 3.3.2.

69.     The business combination closed on July 22, 2022, meaning the 30-day waiting period for exercise of the public warrants lapsed on August 21, 2022.

70.     The public warrants were registered under the Securities Act pursuant to a Form S-4 registration statement that was declared effective on June 30, 2022.

71.     On August, 22, 2022, Alta sent a notice to Getty Images seeking to exercise a portion of its substantial public warrant holdings.

72.     In material breach of the Warrant Agreement, Getty Images refused to honor Alta's exercise notice and repudiated its obligation to do so prior to the effective date of a separate Form S-1 registration statement, which occurred after market close on September 15, 2022.

73.     As a result of Getty Images' breach, Alta was denied the opportunity to exercise the public warrants while they were "in the money."

74.     While that breach continued, Getty Images compounded the harm it had caused to Alta by purporting to redeem all outstanding public warrants for $0.01 each following a redemption period ending October 19, 2022, which it lacked the authority to do due to its ongoing material breach of the Warrant Agreement.

75.     As a direct and proximate result of Getty Images' breach of the Warrant Agreement, Alta has suffered substantial damages in an amount to be proven at trial.

## COUNT II: BREACH OF CONTRACT (IN THE ALTERNATIVE)

76.     Plaintiff repeats each of the foregoing allegations as if fully set forth herein.

77.     The Warrant Agreement requires Getty Images to "as soon as practicable . . . use commercially reasonable efforts to file with the Commission a registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the Warrants." *Id.* § 7.4.1.

78.     Getty Images could have registered the Warrant Shares pursuant to its Form S-4 registration statement submitted and declared effective in anticipation of the business combination that closed on June 22, 2022.

79.     Registration of Warrant Shares pursuant to a Form S-4 registration statement is standard practice for SPAC mergers, and a well-known option to Getty Images and its counsel.

80.     To the extent that Getty Images failed to effectively register the Warrant Shares pursuant to the S-4 registration statement, it breached its obligation to use commercially reasonable efforts to cause those Warrant Shares to be registered under the Securities Act as soon as practicable.

81.     As a result of Getty Images' breach, Alta was denied the opportunity to exercise the public warrants while they were "in the money."

82.     While that breach continued, Getty Images compounded the harm it had caused to Alta by purporting to redeem all outstanding public warrants for $0.01 each following a redemption period ending October 19, 2022, which it lacked the authority to do due to its ongoing material breach of the Warrant Agreement.

83.     As a direct and proximate result of Getty Images' breach of the Warrant Agreement, Alta has suffered substantial damages in an amount to be proven at trial.

**COUNT III: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

84.     Plaintiff repeats each of the foregoing allegations as if fully set forth herein.

85.     Under New York law, the implied covenant of good faith and fair dealing is, in spirit, a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

86.     Under New York law, conduct that is technically permissible under an agreement may nevertheless give rise to a breach of implied covenant of good faith and fair dealing if it is intended to achieve a result which is prohibited by the agreement and which would do away with the fruits of the contract.

87.     Getty Images has breached its duty of good faith and fair dealing by taking deliberate steps designed to prevent Plaintiff from exercising its warrants in accordance with its rights under the Warrant Agreement, including by (1) failing to act in good faith to register the Warrant Shares in a timely fashion; (2) failing to honor Plaintiff's request to exercise its public warrants; (3) asserting bad faith and disingenuous reasons for its failure to honor Plaintiff's request; (4) deliberately attempting to obtain registration of the Warrant Shares on a schedule that was disadvantageous to Plaintiff, while securing a windfall for Getty Images and its insiders; (5) refusing to allow Alta to exercise its public warrants on a cashless basis, at the lower share per warrant ratio than that enjoyed by insiders, while publicly taking the position that it will consider the dilutive effect on stockholders in determining whether to permit public warrants to be exercised on a cashless basis; and (6) taking affirmative steps to stymie Plaintiff's ability to exercise its warrant rights and assert the claims set forth herein.

88.     Getty Images' breaches of its duty of good faith and fair dealing have had the effect of destroying or injuring Plaintiff's rights to receive the fruits of the Warrant Agreement.

89.     Getty Images has acted intentionally and knowingly to deprive Plaintiff of the fruits of the Warrant Agreement.

90.     As a direct and proximate result of Getty Images' breach of the implied covenant of good faith and fair dealing, Alta has suffered substantial damages in an amount to be proven at trial.

**COUNT IV: DECLARATORY JUDGMENT**

91.     Plaintiff repeats each of the foregoing allegations as if fully set forth herein.

92.     Under to the Warrant Agreement, Getty Images' public warrants are exercisable upon (i) the passage of 30 days from completion of the business combination and (ii) the effective registration under the Securities Act of the Warrant Shares.  Warrant Agreement §§ 3.2, 3.3.2.  The Warrant Agreement separately requires Getty Images to "as soon as practicable . . . use commercially reasonable efforts to file with the Commission a registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the Warrants." *Id.* § 7.4.1.

93.     The business combination closed on July 22, 2022, meaning the 30-day waiting period for exercise of the public warrants lapsed on August 21, 2022.

94.     The public warrants were registered under the Securities Act pursuant to a Form S-4 registration statement that was declared effective on June 30, 2022.

95.     On August 22, 2022, Alta sent a notice to Getty Images seeking to exercise a portion of its substantial public warrant holdings.

96.     In breach of the Warrant Agreement, Getty Images refused to honor Alta's exercise notice and repudiated its obligation to do so prior to the effective date of a separate Form S-1 registration statement, which occurred after market close on September 15, 2022.

97.     In the alternative, to the extent that Getty Images failed to effectively register the Warrant Shares pursuant to the Form S-4 registration statement declared effective in anticipation of the business combination, Getty Images breached its obligation under the Warrant Agreement to use commercially reasonable efforts to register those Warrant Shares under the Securities Act as soon as practicable.

98.     Getty Images' breach denied Alta the benefit of its bargain under the Warrant Agreement and substantially defeated the purpose of the Warrant Agreement, therefore constituting a material breach of contract.

99.     Alta is thereby discharged from further performance of its obligations under the Warrant Agreement, including any obligation to tender its shares into Getty Images' purported redemption.

100.    For the foregoing reasons, Alta seeks a declaration that the warrants and Warrant Shares were registered within the meaning of the Securities Act of 1933 as of June 30, 2022, the date when Getty Images' Form S-4 was declared effective by the SEC, and that, therefore, the Warrants were exercisable under the Warrant Agreement beginning on August 21, 2022, 30 days after the business combination closed.

101.    Alta seeks a further declaration that, due to Getty Images' material breach, public warrant holders have no obligation under the Warrant Agreement to tender their warrants in response to Getty Images' redemption notice and that Getty Images is estopped from invoking the redemption right under the Warrant Agreement as a result of its continuing material breach.

102.    The disagreement between the parties over this issue presents a substantial controversy that is sufficiently immediate to warrant this Court's intervention to clarify and settle the dispute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendant as follows:

A.      Awarding general and compensatory damages to Alta in an amount to be proven at trial;

B.      Declaring that the warrants and Warrant Shares were registered within the meaning of the Securities Act of 1933 as of June 30, 2022, the date when Getty Images' Form   S-4 was declared effective by the SEC and that, therefore, the Warrants were exercisable under the Warrant Agreement beginning on August 21, 2022, 30 days after the business combination closed;

C.      Declaring that Getty Images failure to honor Alta's exercise notice and repudiation of its obligation to do so was a material breach of the Warrant Agreement and that material breach excused any obligation of the public warrant holders under the Warrant Agreement to tender their shares in response to Getty Images' redemption notice and estopped Getty Images from invoking the redemption rights included in the Warrant Agreement;

D.      Awarding Alta costs and disbursements, including attorney's fees, related to this dispute; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues that are so triable.

Dated:   October 19, 2022
        New York, New York

CADWALADER, WICKERSHAM & TAFT LLP

By :   /s/ *Nicholas A. Gravante, Jr.*
Nicholas A. Gravante, Jr.
Ellen V. Holloman
Adam K. Magid
Samuel G. Mann
200 Liberty Street
New York, NY 10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
Nicholas.Gravante@cwt.com
Ellen.Holloman@cwt.com
Adam.Magid@cwt.com
Samuel.Mann@cwt.com

*Attorneys for Plaintiff Alta Partners, LLC*