UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
ALTA PARTNERS, LLC,

          Plaintiff,

     -against-

GETTY IMAGES HOLDINGS, INC.,

          Defendant.

CRCM INSTITUTIONAL MASTER
FUND (BVI) LTD., and CRCM
SPAC OPPORTUNITY FUND LP,

          Plaintiffs,

     -against-

GETTY IMAGES HOLDINGS, INC.,

          Defendant.
```

22-cv-8916 (JSR)
23-cv-1074 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Plaintiffs Alta Partners, LLC ("Alta"), CRCM Institutional Master Fund (BVI) Ltd., and CRCM SPAC Opportunity Fund LP (the latter two referred to collectively as "CRCM") held warrants to purchase shares of defendant Getty Images Holdings, Inc. ("Getty"). All agree that, under the applicable contract, the warrants were exercisable 30 days after the closing of the business combination that made Getty a public company, so long as a registration statement for the shares underlying the warrants was effective and a prospectus was current. When the calendar hit the

- 1 -

date in question, August 22, 2022, plaintiffs believed all conditions were met and soon sought to exercise their warrants. Getty refused. In Getty's view, although it had "registered" and filed a prospectus for the underlying warrant shares in a Form S-4 that the SEC declared effective on June 30, 2022, the registration statement covered only the "offer," not the "issuance and sale" of the shares, and the prospectus was no longer "current."

Alta and CRCM separately sued Getty in this Court for breach of contract under several theories of liability, and, in the alternative, for alleged violations of the federal securities laws. The Court consolidated the two actions through the close of discovery, which has now been completed, and all parties have moved for summary judgment. For the reasons explained below, the Court grants summary judgment for Alta and CRCM on Count I of their respective Amended Complaints, but grants summary judgment for Getty on all other claims.

I.   Factual and Procedural Background

Getty, the defendant in both of these consolidated cases, became a public company on July 22, 2022, when it merged with CC Neuberger Principal Holdings II ("CCNB"), a special purpose acquisition company ("SPAC") that had become public through an initial public offering ("IPO") on August 4, 2020. 23-cv-1074, ECF

No. 33 ("CRCM 56.1 Statement"), ¶¶ 1, 7, 9.[1] Through its IPO, CCNB had sold 82.8 million "units," each comprising one class A share of CCNB common stock and one-fourth of a warrant to purchase a class A share of CCNB common stock at an exercise price of $11.50. Id. ¶¶ 9-11, 15. Both the class A shares and the warrants traded on the New York Stock Exchange. Id. ¶ 13. Plaintiffs Alta and CRCM each purchased warrants on the open market. Id. ¶ 29; 22-cv-8916, ECF No. 56 ("Alta 56.1 Statement"), ¶ 86.

The terms governing exercise of the warrants were set forth in a Warrant Agreement between CCNB and a transfer agent, Continental Stock Transfer & Trust Company. Alta 56.1 Statement ¶ 20; see 23-cv-1074, ECF No. 35-1 ("Warrant Agreement"). The Warrant Agreement provided that the warrants could be exercised starting on "the date that is thirty days after the first date on which [CCNB] completes a merger . . . or similar business combination." Warrant Agreement § 3.2. Because CCNB merged with Getty's holding company on July 22, 2022, that meant the warrants could be exercised starting on August 22, 2022. And because the surviving company in the merger was Getty, that meant the warrants, if exercised, would be for shares of Getty stock.

---

[1] To be specific, after becoming public through an IPO, CCNB combined with Griffey Holdings, Inc., Getty's then-private holding company, leaving Getty as the surviving public company. CRCM 56.1 Statement ¶ 24.

The Warrant Agreement imposed two conditions, however, to be met before the warrants could be exercised. In particular, "the Company" -- Getty -- "shall not be obligated to deliver any Ordinary Shares pursuant to the exercise of a Warrant and shall have no obligation to settle such Warrant exercise unless [(1)] a registration statement under the Securities Act with respect to the Ordinary Shares underlying the Public Warrants is then effective and [(2)] a prospectus relating thereto is current, subject to the Company's satisfying its obligations under Section 7.4." Id. § 3.3.2.

In turn, Section 7.4 required "that as soon as practicable, but in no event later than twenty (20) Business Days after the closing of its initial Business Combination, [the Company] shall use commercially reasonable efforts to file . . . a registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the Warrants." Id. § 7.4.1. In addition, "[t]he Company shall use commercially reasonable efforts to cause the same to become effective within sixty (60) Business Days after the closing of its initial Business Combination and to maintain a current prospectus relating thereto." Id.

CCNB filed a registration statement under the Securities Act on SEC Form S-4 on January 18, 2022.[2] See 22-cv-8916, ECF No. 57-4 ("S-4"). The S-4 included a proxy statement for CCNB shareholders to use in voting on the business combination, as well as a prospectus for the shares to be registered. Id. The S-4 referred to Getty as "New CCNB," and registered several categories of securities. Id.; see Alta 56.1 Statement ¶ 48. In particular, it registered 39,260,000 warrants: the "20,700,000 public warrants" that CCNB had issued through its IPO,[3] and "18,560,000 Private Placement Warrants" that CCNB had sold outside of the IPO. S-4 at 3.[4] Of particular relevance here, the S-4 also registered the "39,260,000 shares of New CCNB Class A Common Stock, issuable upon exercise by holders of New CCNB Warrants following the completion of the Business Combination." Id. In a separate table cataloguing "Each Class of Securities to be Registered," the S-4 again listed 39,260,000 "New CCNB Warrants to purchase common stock" and

---

[2] CCNB did so through its subsidiary, Vector Holding, LLC. See CRCM 56.1 Statement ¶ 30.

[3] As noted above, CCNB, through its IPO, sold 82.8 million "units," each of which included a share of CCNB common stock and one-fourth of one warrant to purchase an additional share under the terms of the Warrant Agreement. The 82.8 million units thus collectively represented 20.7 million public warrants (82.8 million units * ¼ warrant), in addition to the 82.8 million shares they comprised.

[4] Because the S-4 is not itself paginated, the Court refers to the page numbers of the PDF containing the S-4 located at 22-cv-8916, ECF No. 57-4.

39,260,000 "New CCNB Class A Common stock underlying warrants."
Id. at 2. The S-4 also listed a registration fee of $41,853.12 for
the 39,260,000 shares of "New CCNB Class A Common stock underlying
[the] warrants." Id.

CCNB filed amended S-4 forms on April 22, 2022 and June 27,
2022, the latter responding to SEC staff comments, reiterating the
above. See CRCM 56. 1 Statement ¶¶ 35-36. The June 27 amended S-4
also included an opinion from CCNB's counsel of the legality and
validity of the registration. Id. ¶ 36. That opinion stated that
it was "being rendered in connection with the registration under
the above-referenced Registration Statement of . . . 39,260,000
New CCNB Warrants and . . . 39,260,000 Warrant Shares." Id. ¶ 37.
Similarly, the prospectus included in the S-4 stated that it was
a "prospectus for 189,735,093 shares of class A common stock";
that figure included the 39,260,000 shares underlying the public
and private warrants. See id. ¶ 32; S-4 at 4. The SEC declared the
S-4 effective on June 30, 2022. CRCM 56.1 Statement ¶ 40.

On August 9, 2022, Getty filed a registration statement on
SEC Form S-1, registering new securities that had not been included
in the S-4.[5] Id. ¶¶ 55-56. The S-1 listed the 39,260,000 shares of

---

[5] These "included shares that had been issued to former Getty
stockholders in the Business Combination, privately placed shares
that had been issued to fund the Business Combination . . . and
the secondary offering of the private placement warrants." CRCM
56.1 Statement ¶ 57.

"Class A Common Stock underlying warrants" as having been "previously registered" on the S-4 that was made effective on June 30, 2022. 23-cv-1074, ECF No. 35-20 ("S-1"), Ex. 107. The S-1 further specified that "[n]o registration fee is payable in connection with the 39,260,000 shares of Class A Common Stock previously registered on a registration statement on Form S-4 (File No. 333-262203), which was declared effective on June 30, 2022 (the 'Prior Registration Statement') because such shares are being transferred from the Prior Registration Statement pursuant to Rule 429(b) under the Securities Act." Id. at n.5. Accordingly, the S-1 continued, "[i]f securities previously registered under the Prior Registration Statement are offered and sold before the effective date of this registration statement, the amount of previously registered securities so sold will not be included in the prospectus hereunder." Id. at n.6. The S-1 thus contained an updated prospectus that pertained to the newly registered securities as well as the shares underlying the warrants, which had been "previously registered" on the S-4. Id.

Getty's share price rose noticeably in the weeks after the merger closed on July 22, 2022, well exceeding both the $9.39 opening share price and the $11.50 exercise price of the warrants. CRCM 56.1 Statement ¶¶ 47-52. For instance, the share price ascended from $10.50 on July 28 to $26.15 on July 29. Alta 56.1 Statement ¶ 84. And the share price closed at $31.36 on August 17.

Id. ¶ 85. Noticing that opportunity for profit, Alta acquired 2,066,371 warrants between July 29 and August 24. Id. ¶ 86. CRCM already held more than 1.4 million warrants, which it had acquired by February 14, 2022, and acquired over 1 million more by August 23. CRCM 56.1 Statement ¶¶ 29, 73-74, 81.

Getty's high share price was, of course, also a boon for its insiders and affiliates. Aside from the benefit that Getty insiders received as shareholders themselves, those insiders also stood to benefit from a provision in the business combination agreement that entitled them to "earnouts" of tens of millions of additional shares if Getty's share price stayed above certain levels for 20 of 30 consecutive trading days. Id. ¶¶ 28, 84-85. In particular, the Getty insiders received a first earnout if the share price stayed above $12.50, a second earnout if it stayed above $15, and a third earnout if it stayed above $17.50. Id. ¶ 28. The exercise of tens of millions of warrants stood as a potential obstacle to those earnouts. If the market were flooded with tens of millions of additional shares, the excess supply may have pushed down Getty's share price, preventing it from maintaining its perch above the earnout targets.

As Getty's share price was rising in August 2022, both Alta and CRCM (as well as other warrant holders) contacted Getty to confirm that their warrants could be exercised under the Warrant Agreement beginning on August 22 -- 30 days after the business

combination had closed. Id. ¶¶ 62, 64-65, 69; Alta 56.1 Statement ¶¶ 97-103. Getty responded that, although "the shares underlying the warrants were included in the S-4," the warrants could not be exercised until they were "registered on the Form S-1." Alta 56.1 Statement ¶ 99; see CRCM 56.1 Statement ¶¶ 63, 70. While Getty filed the S-1 on August 9, the SEC did not declare it effective until September 15. CRCM 56.1 Statement ¶¶ 55, 91. Without any share price dilution from the exercise of the warrants, the Getty insiders met their earnouts on August 25. Id. ¶ 84.

By the time Getty allowed the warrants to be exercised on September 15, Getty's share price gains had disappeared. Although Getty's share price had been above $18 for all of August, by market open on September 16 the share price had plummeted below the $11.50 exercise price of the warrants. Id. ¶ 92; 23-cv-1074, ECF No. 35-13. On September 19, Getty informed warrant holders that, 30 days later, it would be redeeming (essentially, voiding) the warrants and paying just $0.01 per warrant to the holders for their troubles. CRCM 56.1 Statement ¶ 94.[6] Getty indeed redeemed the

---

[6] The Warrant Agreement contained a provision allowing such unilateral redemption of the warrants by Getty under certain circumstances. In particular, "not less than all of the outstanding Warrants may be redeemed, at the option of the Company, at any time while they are exercisable . . . at the price . . . of $0.01 per Warrant; provided that the last reported sales price of the Ordinary Shares reported has been at least $18.00 per share . . . on each of twenty trading days within the thirty-trading day period ending on the third Business Day prior to the date on which notice of the redemption is given." Warrant Agreement § 6.1 (emphasis

warrants on October 19. Id. ¶ 97; ECF No. 38, ¶ 97. At no point between Getty's notice of the redemption and October 19 did its shares trade at, or exceed, the $11.50 exercise price. ECF No. 38, ¶ 97.

On October 19, 2022, Alta sued Getty in this Court for breach of the Warrant Agreement, including breach of the implied covenant of good faith and fair dealing, and, in the alternative, brought a claim under Section 11 of the Securities Act for filing a materially misleading registration statement. 22-cv-8916, ECF No. 1. CRCM filed a similar suit on February 8, 2023. 23-cv-1074, ECF No. 1. On February 17, 2023, the Court consolidated the two actions "through the close of discovery" with the consent of both parties. 22-cv-8916, ECF No. 19.

Discovery closed in both cases on August 28, 2023. See 23-cv-1074, Minute Entry of 6/21/23. On September 11, Alta and CRCM each moved for summary judgment, and Getty separately cross-moved for summary judgment in both actions. See 22-cv-8916, ECF Nos. 51, 55; 23-cv-1074, ECF Nos. 29, 34. All parties filed answering papers on September 25, see 22-cv-8916, ECF Nos. 62, 65; 23-cv-1074, ECF Nos. 37, 42, and replies on October 2, see 22-cv-8916, ECF Nos.

---

omitted). The Warrant Agreement required Getty to provide 30 days' notice of such a redemption, id. § 6.3, which it did, CRCM 56.1 Statement ¶ 94.

68, 71; No. 23-cv-1074, ECF Nos. 45, 48. The Court heard oral argument on October 10.

II.  Legal Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating the record, the Court construes "the evidence in the light most favorable to the non-moving party and draw[s] all reasonable inferences in" favor of that party. Williams v. N.Y.C. Hous. Auth., 61 F.4th 55, 68 (2d Cir. 2023). The Court must enter "summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." El-Nahal v. Yassky, 835 F.3d 248, 252 (2d Cir. 2016).[7]

III.  Analysis

A.  Alta and CRCM are entitled to summary judgment on Count I of their respective Amended Complaints.

All parties have moved for summary judgment on Count I of plaintiffs' respective Amended Complaints, which allege that Getty breached the Warrant Agreement by refusing to allow Alta and CRCM to exercise their warrants 30 days after Getty's business

---

[7] Here and elsewhere, all internal alterations, citations, and quotation marks are omitted unless otherwise indicated.

combination with CCNB. There is no dispute that the Warrant Agreement governs the exercise of Alta's and CRCM's warrants, that the Agreement imposes obligations on Getty as the successor to CCNB, and that Alta and CRCM have rights under the Agreement as third-party beneficiaries. The parties also agree that the Warrant Agreement is governed by New York law.

"Under New York law, the elements of a breach of contract claim are (i) the existence of a contract; (ii) performance of the contract by one party; (iii) breach by the other party; and (iv) damages suffered as a result of the breach." FaZe Clan Inc. v. Tenney, 467 F. Supp. 3d 180, 189 (S.D.N.Y. 2020). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 649 (2d Cir. 2011). When that is the case, a court may not look beyond "the four corners of the contract" for its meaning. Ellington v. EMI Music, Inc., 21 N.E.3d 1000, 1003 (N.Y. 2014).

There is no dispute that the Warrant Agreement formed a contract and that both Alta and CRCM performed. Rather, the parties dispute whether Getty breached the Agreement and whether either plaintiff suffered damages. Beginning with breach, Getty contends that it was justified in refusing to allow Alta or CRCM to exercise their warrants on August 22, 2022, 30 days after the business combination closed, because not all of the Warrant Agreement's

conditions for exercise had been met. In particular, Getty argues that no registration statement was effective for the "issuance and sale" of the shares underlying the warrants until September 15, and that the prospectus for those shares was not "current" when Alta and CRCM tried to exercise their warrants. 22-cv-8916, ECF No. 51 ("Getty Mem. against Alta"), at 8-15; 23-cv-1074, No. 29 ("Getty Mem. against CRCM"), at 8-15. Both of those arguments fail.

The Warrant Agreement provides that "the Company shall not be obligated to deliver any Ordinary Shares pursuant to the exercise of a Warrant and shall have no obligation to settle such Warrant exercise <u>unless a registration statement under the Securities Act with respect to the Ordinary Shares underlying the Public Warrants is then effective</u>." Warrant Agreement § 3.3.2 (emphasis added). That condition was plainly met by June 30, 2022, when the S-4 that registered the "39,260,000 shares of New CCNB Class A Common Stock, issuable upon exercise by holders of New CCNB Warrants following the completion of the Business Combination," was made effective by the SEC. S-4 at 3; CRCM 56.1 Statement ¶ 40.

Getty itself confirmed as much when it later filed the S-1 on August 9, 2022, which it did to register new securities that had not been included in the S-4. CRCM 56.1 Statement ¶¶ 55-56. The S-1 listed the 39,260,000 shares of "Class A Common Stock underlying warrants" as having been "previously registered" on the S-4 that was made effective on June 30, 2022. S-1, Ex. 107. The S-1 further

specified that "[n]o registration fee is payable in connection with the 39,260,000 shares of Class A Common Stock previously registered on a registration statement on Form S-4 (File No. 333-262203), which was declared effective on June 30, 2022." Id. at n.5. It would be hard for Getty to have been any clearer that "a registration statement under the Securities Act with respect to the Ordinary Shares underlying the Public Warrants [was] then effective" as of June 30, 2022 -- well in advance of when Alta and CRCM sought to exercise their warrants in August 2022, 30 days after the business combination closed on July 22, 2022. Warrant Agreement § 3.3.2.

Getty's arguments to the contrary distort the text of the Warrant Agreement, federal securities law, and Getty's own contemporaneous representations. Getty's first response is that "the plain language of the Warrant Agreement . . . states that a registration statement with respect to the issue and sale of the Warrant Shares was to be filed after the closing of the Business Combination." 22-cv-8916, ECF No. 62 ("Getty Opp. to Alta Mot."), at 3; 23-cv-1074, ECF No. 37 ("Getty Opp. to CRCM Mot."), at 5. That contention is a flat misreading. Section 3 of the Warrant Agreement, which governs the "Terms and Exercise of Warrants," contains no such timing requirement. Getty points to a different part of the Agreement, governing its own obligations, which states, "The Company agrees that as soon as practicable, but in no event

later than twenty (20) Business Days after the closing of its initial Business Combination, it shall use commercially reasonable efforts to file with the Commission a registration statement for the registration, under the Securities Act, of the Ordinary Shares issuable upon exercise of the Warrants." Warrant Agreement § 7.4.1.

But that provision's reference to filing the registration statement "in no event later than twenty (20) Business Days after the closing of [the] Business Combination" sets a deadline for when the statement must be filed. Id. It does not say, as Getty suggests, that the registration statement could not have been filed before the business combination closed. In fact, the Warrant Agreement required Getty to "use commercially reasonable efforts to file" the registration statement "as soon as practicable," id., which certainly contemplates filing it before the business combination closed. Indeed, Getty itself acknowledges that "it is common for a Form S-4 registration statement to be filed before a de-SPAC business combination closes." Getty Opp. to Alta Mot. 3; Getty Opp. to CRCM Mot. 6.

Getty even concedes that "[t]here is no dispute that the Form S-4 'registered' the Warrant Shares." Getty Opp. to Alta Mot. 9; Getty Opp. to CRCM Mot. 11. Getty also agrees that the S-4 was effective as of June 30, 2022. But Getty now argues that the S-4 registered only the offer of the shares underlying the warrants, not the "issuance and sale" of those shares. That argument unravels

in several directions. For starters, the Warrant Agreement -- the source of the obligation at issue -- made no such distinction. Rather, it required only that "a registration statement under the Securities Act with respect to the Ordinary Shares underlying the Public Warrants is then effective." Warrant Agreement § 3.3.2 (emphasis added). Even if the Court were to accept arguendo that the S-4 registered only the "offer" of the warrant shares, the S-4 would still be a registration statement "with respect to" those shares. Id.

Getty nevertheless argues that "the Form S-4 could not be used for the issuance and sale of the Warrant Shares, and a separate registration statement (in this case, the Form S-1) was required to be declared effective before those shares could be issued and sold by Getty Images." Getty Opp. to Alta Mot. 9-10; Getty Opp. to CRCM Mot. 11. Getty offers no credible basis, factual or legal, for that assertion.

The S-1 specifically lists the 39,260,000 shares of "Class A Common Stock underlying warrants" as having been "previously registered" on the S-4 that was made effective on June 30, 2022. S-1, Ex. 107. It makes no distinction between a registration for an offer of those shares and a registration for their "issuance and sale." To the contrary, it states that "[n]o registration fee is payable in connection with the 39,260,000 shares of Class A Common Stock previously registered on Form S-4 (File No. 333-

262203), which was declared effective on June 30, 2022 (the 'Prior Registration Statement') because such shares are being transferred from the Prior Registration Statement." Id. at n.5. In other words, Getty had already paid the registration fee for the shares underlying the warrants because they had already been registered in an effective registration statement. The S-1 merely transferred the already effective registration of those shares from the S-4, "the Prior Registration Statement," to the S-1, as permitted by Rule 429(b) promulgated under the Securities Act. Id. at nn.5-6.

The kicker, though, is the S-1's express provision that "[i]f securities previously registered under the Prior Registration Statement are offered and sold before the effective date of this registration statement, the amount of previously registered securities so sold will not be included in the prospectus hereunder." Id. at n.6 (emphasis added). The only such "previously registered securities" that the S-1 mentioned were the 39,260,000 shares of Class A common stock underlying the warrants. Id. The S-1 thus clearly contemplated -- and informed shareholders and the SEC alike -- that the S-4 was effective not only for the "offer" of the shares underlying the warrants, but also for their "issuance and sale."

Further still, Getty's invented-for-litigation distinction between a registration statement for the offer of shares, and a separate registration statement for the issuance and sale of those

same shares, finds no support in the federal securities laws. Indeed, "[a] registration statement permits an issuer, or other persons, to make . . . the offers and sales described in the registration statement." SEC v. Cavanagh, 155 F.3d 129, 133 (2d Cir. 1998) (emphasis added). And the SEC's "regulations allow for delayed or continuous offering and sale of securities" under a single registration statement. Id. That is exactly what the S-4 did here. The fact that, as Getty points out, Section 2(a)(3) of the Securities Act differentiates between an "offer to sell" a security and a "sale" of that security, see 15 U.S.C. § 77b(a)(3), does not mean that a single registration statement cannot cover both. Nor does Section 5 of the Securities Act, which provides that a registration statement must be filed to offer a security and must be effective to sell that security, see 15 U.S.C. § 77e(a), (c), support Getty's assertion.

Getty is also incorrect that the instructions to the S-4 prohibit using the form to register the issuance and sale of the warrant shares. Those instructions specifically contemplate that a registration statement contained in an S-4 may "relate[] to offerings of securities pursuant to Rule 415(a)(1)(viii)."[8] SEC

---

[8] The SEC uses the term "offering" to refer to "an offer and sale of securities that has been registered under the Securities Act." SEC, Glossary, *Registered Offering*. The SEC's guidance thus contemplates a single registration for both "an offer and sale." Id.

Form S-4, Instruction H. In turn, Rule 415(a)(1)(viii) allows for "[s]ecurities which are to be issued in connection with business combination transactions" to be "registered for an offering to be made on a continuous or delayed basis in the future." 17 C.F.R. § 230.415(a)(1)(viii). Because the warrants here could only be exercised -- and the resulting shares issued -- after a business combination, the S-4 indeed registered securities "to be issued in connection with [a] business combination transaction[]." Id.; see Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 84-86 (2006) (emphasizing the "broad" meaning of the phrase "in connection with" in federal securities laws).

Indeed, both Alta and CRCM note that in another de-SPAC business combination that was structured similarly to the one between CCNB and Getty, the SEC informed the issuer, Li-Cycle, that Li-Cycle was "registering the [Li-Cycle] Shares issuable upon exercise of [Li-Cycle] Warrants in this F-4." 22-cv-8916, ECF No. 67-5, at 3. (The form used in that transaction was an F-4, not an S-4, because it was a foreign transaction.) The SEC made no distinction between registering the shares underlying the warrants only for offer, rather than for both offer and sale.[9]

---

[9] Getty also points to "extrinsic evidence" of "market practices" catalogued by one of its experts, showing that in a majority of de-SPAC transactions in a particular sample, the issuer filed both an S-4 and a later S-1, as Getty did. Getty Opp. to Alta Mot. 15-17; Getty Opp. to CRCM Mot. 18-21. Such evidence is unconvincing. First, as Getty itself acknowledges, the Court may consider such

Getty next argues that, even if the S-4 satisfied the Warrant Agreement's requirement for an effective registration statement "with respect to" the shares underlying the warrants as of June 30, 2022, the warrants still could not be exercised on August 22, 2022 -- 30 days after the business combination closed -- because the "prospectus relating" to those shares was not "current" on that date and did not become so until the updated prospectus in the S-1 became effective on September 15, 2022. Warrant Agreement § 3.3.2. The record does not support Getty's contention.

The S-4 that was declared effective on June 30, 2022 contained a prospectus with "over 800 pages of detailed information concerning Getty's business and financial condition, pro forma financial information on the post-closing company, the securities being registered, risk factors involved with the offering, the

_____

extrinsic evidence only if it "were to conclude that the reference to an 'effective' registration statement in the Warrant Agreement is ambiguous." Getty Opp. to Alta Mot. 15; Getty Opp. to CRCM Mot. 18. It is not, which Getty elsewhere concedes. See Getty Mem. against Alta 8 (heading referring to "the clear and unambiguous terms of the Warrant Agreement"); Getty Mem. against CRCM 9 (same). Second, even if the Court did consider the evidence, it is practically meaningless. The evidence says nothing about whether those other issuers permitted warrants to be exercised based on the S-4. There is nothing strange about filing an S-1 after a company is newly public, as Getty did here, to register additional shares that were not previously registered in an S-4. Such a practice does not mean that the S-4 was somehow not "effective" for selling the shares it did register.

business combination, and other matters."[10] 23-cv-1074, ECF No. 34 ("CRCM Mem."), at 17. According to Getty, that prospectus was no longer "current" after the business combination in fact closed and Getty had filed an additional quarter of financial results.

A prospectus is not current if there have been "[p]ost-effective developments which materially alter the picture presented in the registration statement." SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1095 (2d Cir. 1972), abrogated on other grounds, Liu v. SEC, 140 S. Ct. 1936 (2020). But Getty does not even attempt to explain, or mobilize evidence in the record that shows, how the post-effective disclosures were material. The prospectus had already provided "voluminous pro forma financials, extensive information on Getty's post-closing capital structure, and the maximum proceeds Getty could receive from warrant exercise." 23-cv-1074, ECF No. 48 ("CRCM Reply"), at 7. Getty does not argue, for instance, that the additional quarter of financial information materially changed the picture that a reasonable investor would have of the company or that the information in the S-4 prospectus did not adequately capture the business and financials of post-closure Getty. See Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38 (2011) (information is material "when

---

[10] Getty then issued a final prospectus for the S-4 on July 1, 2022, reflecting additional shares of Getty common stock to be issued "upon completion of the Business Combination." CRCM 56.1 Statement ¶ 41.

there is a substantial likelihood that the disclosure of [the information] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available").

Unable to avoid the conclusion that it breached the Warrant Agreement, Getty disputes that Alta and CRCM can show any damages. Getty's arguments again fall short. As the parties agree, "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 384 (2d Cir. 2006). As a result, under New York law, "the measure of damages" for failing to deliver a stock in accordance with an option or warrant agreement "is the difference between the option price and the market value of the stock." Id. at 385. Indeed, Getty agrees that Alta and CRCM are "entitled to market value damages to the extent that they can be proven with reasonable certainty." Getty Opp. to Alta Mot. 20; Getty Opp. to CRCM Mot. 22.

Both Alta and CRCM calculate damages "at the time of the breach" by subtracting, for each warrant they sought to exercise, the exercise price of $11.50 from the market price of a Getty share. Boyce, 464 F.3d at 384; see 22-cv-8916, ECF No. 55 ("Alta Mem."), at 18-19; CRCM Mem. 23-25. Consistent with New York law, they calculate the market price of a Getty share on the intended

exercise date as "the mean between the highest and lowest quoted selling prices." Boyce, 464 F.3d at 385. Getty does not dispute the mechanics of those calculations. Rather, Getty responds that the "market price" of a Getty share at that time did not actually represent the share's value because of its "inflated stock trading price." Getty Opp. to Alta Mot. 20-23; Getty Opp. to CRCM Mot. 21-25. As Getty emphasizes, "[t]he terms 'price' and value are not necessarily synonymous; under certain circumstances market price may not adequately reflect the true value of a security." Mathias v. Jacobs, 238 F. Supp. 2d 556, 576 (S.D.N.Y. 2002).

But Getty conflates the abstract notion of a share's intrinsic value with what is actually used to calculate damages -- "the market value of the stock." Boyce, 464 F.3d at 385. And when "dealing with a publicly traded stock," like Getty's, determining the market value is "straightforward." Id. It is "the mean between the highest and lowest quoted selling prices" on a particular date, which Alta and CRCM calculated here. Id.

Getty's rejoinder is that "[i]t is settled that when the value of securities is artificially inflated by fraud and improprieties or other relevant facts of which the marketplace did not have reasonable knowledge, the public trading price of the shares is not the measure of fair market value." Mathias, 238 F. Supp. 2d at 576. Even granting that premise arguendo, however, Getty fails to create a genuine dispute, let alone show, that any "fraud and

improprieties or other relevant facts of which the marketplace did not have reasonable knowledge" affected its stock price. Id. All Getty offers on that front is an opinion from its expert that "the spike in Getty Images' stock price was due to the disclosure of the small float and manipulation by traders (potentially due to a short squeeze)." Getty Opp. to Alta Mot. 22; Getty Opp. to CRCM Mot. 23. But an upward movement in share price in response to a "disclosure" merely shows an informed market at work, not "manipulation" or "fraud and improprieties." Moreover, even if the Court assumes that a "short squeeze" on a stock means that its market price cannot be considered its "market value," Getty's expert candidly acknowledges he was referring merely to "rumors" and "speculation over a possible short squeeze," not his own analysis that one was occurring. 23-cv-1074, ECF No. 35-49, at 13. Rumors and speculation are not the stuff of which genuine disputes are made.

Getty also argues that the market price would have been lowered by multiple holders simultaneously seeking to exercise their warrants. That may be so. But it is not enough to conclude, under the applicable legal standard, that Alta and CRCM are not entitled to damages. "Where . . . the non-breaching party has proven the fact of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damage is upon the wrongdoer." Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d

125, 141 (2d Cir. 2016). "Doubts are generally resolved against the party in breach." Id. "Therefore, a plaintiff need only show a stable foundation for a reasonable estimate of the damages incurred as a result of the breach." Id. "At that point, the burden of any uncertainty as to the amount of damages is on the breaching party." Id. Getty cannot meet that burden by pointing to speculation.

Getty is right, however, that plaintiffs' damages must be limited to those for warrants they acquired before, and actually sought to exercise at the time of, Getty's breach. Although there is no suggestion that CRCM is seeking damages for warrants it did not possess at the relevant time, Alta argues that it "is also entitled to damages for the additional 11,593,149 Warrants it acquired after Getty's August 24, 2022 breach."[11] Alta Mem. 19. Even assuming arguendo that Alta is an assignee of any breach of contract claims accrued by whomever held the warrants on the date of the breach, or that those claims somehow inhere in the transfer of the warrants themselves, Alta cannot show that those prior holders ever sought to exercise their warrants. The Court agrees with Getty that "[b]ecause Alta has admitted that it does not know who the former holders were, it cannot meet its burden to prove

---

[11] Although August 22, 2022 is the date that plaintiffs argue the warrants became exercisable, August 24 is when Alta attempted to exercise its warrants and is thus the date of Getty's breach with respect to Alta. Alta 56.1 Statement ¶¶ 116-23.

that those holders performed (or would have performed) under the Warrant Agreement." Getty Opp. to Alta Mot. 19.

Aside from Getty's "market value" argument, which the Court rejects, Getty does not challenge Alta's or CRCM's damages calculations for the warrants that each acquired and sought to exercise before the breach. As a result, removing the warrants that Alta purchased after Getty's breach and before accounting for prejudgment interest, Alta has shown that it is entitled to $36,946,713 in damages and CRCM has shown that it is entitled to $51,000,000 in damages for Getty's breach of the Warrant Agreement.[12] See Alta Mem. 18-19; CRCM Mem. 23-24.

> B. Getty is entitled to summary judgment on Alta's and CRCM's other claims.

------

[12] New York law provides for prejudgment interest for "a sum awarded because of breach of performance of a contract," N.Y. C.P.L.R. § 5001(a), "at the rate of nine per centum per annum," id. § 5004. "The amount of interest shall be computed by the clerk of the court," but "[t]he date from which interest is to be computed shall be specified in the" Court's "decision." Id. § 5001(c). Prejudgment interest begins for Alta's damages on August 24, 2022. See Alta 56.1 Statement ¶¶ 116-23. Prejudgment interest begins for most of CRCM's damages -- for 2,965,141 warrants -- on August 22, 2022. See CRCM 56.1 Statement ¶¶ 73-80. However, CRCM then sought to exercise 45,623 warrants on August 23, 2022; prejudgment interest for its damages from those warrants thus begins on August 23. See CRCM Mem. 24 n.10; CRCM 56.1 Statement ¶ 81. Because CRCM's submissions do not state, either as a percentage or dollar value, how much of its damages accrued on August 22 and how much accrued on August 23, CRCM must file a supplemental submission with that information by no later than one week from the entry of this Opinion and Order.

1. Getty is entitled to summary judgment on Counts II and IV of Alta's Amended Complaint.

Count II of Alta's Amended Complaint alleges that Getty's forced redemption of the warrants, for $0.01 each on October 19, 2022, violated a separate provision of the Warrant Agreement. Only Getty has moved for summary judgment on that claim. Count IV of Alta's Amended Complaint alleges that Getty breached the implied covenant of good faith and fair dealing in several respects, but the only theory of liability that Alta now advances for that claim -- both in its own motion for summary judgment and in opposition to Getty's cross-motion -- is again based on Getty's forced redemption of the warrants on October 19, 2022.

Section 6.1 of the Warrant Agreement provides that, at Getty's option, "all of the outstanding Warrants may be redeemed . . . at any time while they are exercisable and prior to their expiration . . . upon notice to the Registered Holders of the Warrants . . . at the price . . . of $0.01 per Warrant; provided that the last reported sales price of the Ordinary Shares reported has been at least $18.00 per share . . . on each of twenty trading days within the thirty-day trading period ending on the third Business Day prior to the date on which notice of the redemption is given." Warrant Agreement § 6.1. Getty exercised that option on September 19, 2022, when it provided 30 days' notice of its intent to redeem all outstanding warrants. Alta 56.1 Statement ¶ 140.

Getty complied with Section 6.1's terms. Although Alta and CRCM contend that the warrants became exercisable on August 22, 2022 -- 30 days after the business combination -- there is no dispute that the warrants were exercisable by September 19, when Getty provided the redemption notice. Indeed, Getty began allowing the warrants to be exercised on September 15, when the S-1 became effective. Similarly, there is no dispute that during "the thirty-day trading period ending on the third Business Day prior to" September 19, Getty's share price was at least $18 on twenty of those trading days. Warrant Agreement § 6.1.

Count II of Alta's Amended Complaint nevertheless alleges that Getty breached Section 6.1 because that thirty-day trading period did not begin after the warrants became exercisable. See 22-cv-8916, ECF No. 18 ("Alta FAC"), ¶¶ 129-39. That position finds no support in the unambiguous terms of the contract, which includes no requirement that the thirty-day lookback period for Getty's share price begin only after the warrants are exercisable. All that is required is that the warrants be exercisable at the time of the redemption notice, which they were. The Court thus grants summary judgment for Getty dismissing Count II.

Alta fares no better by arguing that the same conduct was instead a breach of the implied covenant of good faith and fair dealing. "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." 511 W. 232nd Owners

- 28 -

Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002).
"This covenant embraces a pledge that neither party shall do
anything which will have the effect of destroying or injuring the
right of the other party to receive the fruits of the contract."
Id. A claim for breach of that covenant cannot "be used to add
contract terms not bargained for." Trustpilot Damages LLC v.
Trustpilot, Inc., 2021 WL 2667029, at *9 (S.D.N.Y. June 29, 2021).
But that is just what Alta seeks to do in contending that the
Warrant Agreement also contained an unwritten requirement about
the start time of the 30-day trading period before a redemption
notice.

Alta seeks to avail itself of Getty's statement in the S-4,
more than a year after the Warrant Agreement was entered in 2020,
that "[t]he redemption criteria for the [Getty] Warrants . . .
have been established to prevent a redemption call unless there is
at the time of the call a significant premium to the [Getty]
Warrant exercise price." Alta Mem. 22 (alterations and ellipses in
original). There is no basis for Alta's argument that statements
Getty made about its motivation for agreeing to a certain contract
term, made more than a year after the contract was formed, can
supersede the plain terms of the contract itself. See UBS Fin.
Servs., 660 F.3d at 649 ("[A] written agreement that is complete,
clear and unambiguous on its face must be enforced according to
the plain meaning of its terms."). Because Alta cannot show that

Getty's redemption notice destroyed or injured its right "to receive the fruits of the contract" as written, 511 W. 232nd Owners Corp., 773 N.E.2d at 500, the Court grants summary judgment for Getty dismissing Count IV of Alta's Amended Complaint.

      2. Getty is entitled to summary judgment on Count II of CRCM's Amended Complaint.

      Unlike Alta, CRCM has not moved for summary judgment on its claim that Getty breached the implied covenant of good faith and fair dealing. Getty, however, has so moved. CRCM's claim is not based on Getty's forced redemption of the warrants but instead on the same conduct as the breach of contract claim in Count I -- Getty's refusal to permit CRCM to exercise its warrants 30 days after the business combination closed. See 22-cv-8916, ECF No. 27 ("CRCM FAC"), at ¶¶ 136-42. But "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled." Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013). The Court thus grants summary judgment for Getty dismissing Count II of CRCM's Amended Complaint.

      3. Getty is entitled to summary judgment on Count III of Alta's Amended Complaint and Counts III-IV of CRCM's Amended Complaint.

Count III of Alta's Amended Complaint and Counts III-IV of CRCM's Amended Complaint, which allege that Getty failed to make commercially reasonable efforts to register the warrant shares and keep a current prospectus, are pled only in the alternative to Count I. Because the Court grants summary judgment for plaintiffs on Count I, the Court grants summary judgment for Getty dismissing Count III of Alta's Amended Complaint and Counts III-IV of CRCM's Amended Complaint.

> 4. Getty is entitled to summary judgment on Count VI of Alta's Amended Complaint.

Getty, but not Alta, moves for summary judgment on Count VI of Alta's Amended Complaint, which asks for declaratory judgment regarding Getty's breach of contract. A "declaratory judgment claim [that] is duplicative of [a] breach of contract claim" should be "dismissed." Optanix, Inc. v. Alorica Inc., 2021 WL 2810060, at *1 (S.D.N.Y. July 6, 2021). "Declaratory judgments," like injunctions, "are remedies, not causes of action." Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010). And because "declaratory relief is intended to operate prospectively," "[t]here is no basis for declaratory relief where only past acts" -- such as a breach of contract for which damages are sought -- "are involved." Nat'l Union Fire Ins. Co. v. Int'l Wire Grp., Inc., 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003). The Court thus

grants summary judgment for Getty dismissing Count VI of Alta's Amended Complaint.

    5. Getty is entitled to summary judgment on Count V of Alta's Amended Complaint and Counts V-VII of CRCM's Amended Complaint.

The remaining claims all feature the federal securities laws and are specifically pled in the alternative to the allegation that Getty breached the Warrant Agreement. Because the Court grants summary judgment for Alta and CRCM on Count I of their respective Amended Complaints, the federal securities claims do not apply. The Court thus grants summary judgment for Getty dismissing Count V of Alta's Amended Complaint and Counts V-VII of CRCM's Amended Complaint.

IV.  <u>Conclusion</u>

The Court grants summary judgment for Alta and CRCM on Count I of their respective Amended Complaints. Getty is liable to Alta for $36,946,713 in damages, plus prejudgment interest to be calculated by the Clerk of 9% per annum beginning on August 24, 2022. Getty is liable to CRCM for $51,000,000 in damages, plus prejudgment interest of 9% per annum. The Court will determine the commencement date of CRCM's prejudgment interest after receiving a submission from CRCM, to be filed no later than one week after entry of this Opinion and Order, that states how much of its damages occurred on August 22, 2022 and how much of its damages

occurred on August 23, 2022. For Case Number 22-cv-8916, the Clerk is respectfully directed to close document 54 on the docket, enter final judgment, and close the case. For Case Number 23-cv-1074, the Clerk is respectfully directed to close document 32 on the docket.

    SO ORDERED.

New York, NY
October 26, 2023

JED S. RAKOFF, U.S.D.J.